IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF KANSAS

TRACEY CORRISTON,                      )
                                       )
                   Plaintiff,          )
                                       )
        v.                             )          Case No. 07-1226-WEB
                                       )
BOARD OF COUNTY COMMISSIONERS          )
OF SEDGWICK COUNTY, KANSAS,            )
                                       )
_____Defendant._____)

MEMORANDUM AND ORDER

This case comes before the court on the defendant's Motion for Summary Judgment

(Doc. 74).  Plaintiff alleges she was subject to sexual harassment, racial harassment, and

retaliation while employed at the Sedgwick County Health Department.  Plaintiff also raises a

claim for constructive discharge.  For the reasons stated herein, the defendant's motion is

granted.

        I.  Jurisdiction

Federal courts are courts of limited jurisdiction and may only exercise jurisdiction when

specifically authorized to do so.  Castandea v. I.N.S., 23 F.3d 1576, 1580 (10th Cir. 1994).  The

court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

        II.  Facts

The defendant included an extensive list of facts in the Motion for Summary Judgment.

The plaintiff, in her response, stated that the facts were controverted or uncontroverted.  The

controverted facts were supplemented with deposition testimony, but not a factual statement.

The court has attempted, where applicable, to include the plaintiff's deposition response in the

1

relevant facts.  The facts are viewed in the light most favorable to the nonmoving party.  <u>Allen</u>

<u>v. Muskogee</u>, 119 F.3d 837, 839 (10th Cir. 1997).  The plaintiff also included a section titled

"Plaintiff's Statements of Material Facts Reserved for Trial."  The facts appear to be duplicative

of the facts previously cited by the plaintiff.

     1.  The plaintiff, Tracey Corriston, was born in the Phillippines in 1970.  Her mother is a

Philippine native, and she has a grandfather of Spanish decent.  Corriston came to the United

States with her parents in 1971.  (Corriston Depo., pp. 9-10, 32, 34, Plaintiff Exh. 1).

     2.  In June 2004, the plaintiff began employment with the Sedgwick County Health

Department.  Her initial job at the Health Department was in an administrative officer position.

Her immediate supervisor was William Farney (Farney).  Farney's job title was the

Administrative Services Director.  At the time the plaintiff was hired, Farney was also the acting

Director of the Health Department.  (Corriston Depo., p. 19-21, Plaintiff Exh. 1; Farney Depo.,

pp. 3-4, 28-29, Plaintiff Exh. 4).

     3.  On August 16, 2004, plaintiff sent an email to Farney requesting permission to attend

an upcoming CPR class.  Farney sent an email back to her on the next day stating: "Only if you

promise to use it on me as needed."  (Corriston Depo. P. 39-41, Plaintiff Exh. 1; Farney Depo.,

p. 53-55; Farney Email 8/17/2004, Plaintiff Exh. 9).

     4.  Plaintiff thought Farney's reply was inappropriate and it made her feel uncomfortable.

She did not file an official complaint.   (Corriston Depo., p. 39-41, plaintiff Exh. 1).

     5.  On February 7, 2005, Lori Vanderford, the Health Department's finance manager,

asked Ana Arrendondo, who is Hispanic, "why do your people smell the way they do?"  Plaintiff

was present when the question was asked.  (Corriston Depo., pp. 44-46, 49-51, 60, Plaintiff Exh.

1)

6.   On February 8, 2005, plaintiff was told by two other employees that Vanderford had also made two different racial comments in the past.  (Corriston Depo., pp. 44, 46-48, Plaintiff Exh. 1).

7.   Plaintiff was told that Vanderford referred to Brazilian nuts as "nigger toes."  Plaintiff was not present when this comment was made.  (Corriston Depo., p. 46-47, Plaintiff Exh. 1).

8.   Plaintiff was told that Vanderford referred to an employee of Middle Eastern ancestry as a "rag head."  Plaintiff was not present when this comment was made.  (Corriston Depo., p. 46-48, Plaintiff Exh. 1).

9.   On February 8, 2005, Corriston and Arrendondo met with Farney, the acting Director of the Health Department, and informed him of the racial comments  made by Vanderford.  Corriston reminded Farney of his responsibility to directly address these matters with Vanderford, and that a report to the Sedgwick County Human Resources Diversity & Employee Relations Manager, Dorsha Kirksey, was required.  Farney directed plaintiff to talk to Vanderford about the matter and said he would speak to her as well.  (Corriston Depo., pp. 44-45, 48-49, Plaintiff Exh. 1;  Farney Depo., p. 34-36, Plaintiff Exh. 4).

10.   On or about February 8, 2005, Vanderford and plaintiff met in Vanderford's office when plaintiff advised Vanderford of the allegations.  Vanderford denied the allegations.  She then stated, "If I did say anything, it was taken out of context."  (Corriston Depo., p. 49-51, Plaintiff Exh. 1).

11.   On February 8, 2005, plaintiff also advised Dorsha Kirksey (an employee in the Human Resources Department), of the comments made by Vanderford, and of the meeting with

Farney regarding the comments.  (Corriston Depo., pp. 51-52, 62-63, Plaintiff Exh.1;  Kirksey Depo, pp. 45-47, 55-56, Plaintiff Exh. 3).

12.  On or about April 21, 2005, plaintiff went to Farney's office.  Farney inquired about her doctor appointment, and she told him she was having her back manipulated for back pain. Farney was staring at her chest during the exchange.  (Corriston Depo., p. 53-57, Plaintiff Exh. 1; Farney Depo., pp. 55, 80, Plaintiff Exh. 4;  Corriston's Statement of Facts, Defendant  Exh. 3).

13.  This exchange made the plaintiff feel uncomfortable because at the time she was contemplating breast reduction surgery.  Corriston did not file a complaint.  (Corriston Depo., p. 56-57, Plaintiff  Exh. 1).

14.  In May 2005, Corriston and another employee advised Kirksey that Farney had not taken any action regarding the remarks made by Vanderford.  Kirksey began a formal investigation.  (Kirksey Depo., p. 57-58, Plaintiff Exh. 3).

15.  On May 23, 2005, plaintiff sent Farney a request seeking authorization for a workshop opportunity for Arredondo and herself.  Farney was not in favor of sending plaintiff and Arredondo to this free worship opportunity that was specific to their job duties and over a lunch hour.  (Corriston Depo., p. 57-61, Plaintiff Exh. 1).

16.  When plaintiff was working for Farney, between June 2004 and October 2005, her desk was immediately outside his office.  He would often lean over her desk at a 90 degree angle to talk to her.  It made the plaintiff feel uncomfortable.  (Corriston Depo., pp. 19, 22, 116-118, Plaintiff's Exh. 1; Farney Depo., pp. 31, 76-77, Plaintiff Exh. 4).

17.  On August 2, 2005, Kirksey emailed her recommendations to Jo Templin, Human

Resource Director; Kathy Sexton, Assistant County Manager; Mr. Mueller, (title unknown); William Buchanan, County Manager; Jennifer Magana, Assistant County Counselor; and Claudia Blackburn, Health Department Director, following her investigation of the comments made by Vanderford.  Her recommendation was that William Farney be either demoted or terminated.  (Kirksey Depo., pp. 51-52, 110-111, 120, Plaintiff Exh. 3).

18.  Following Kirksey's initial recommendation, there was a meeting held between Ms. Kirksey, Ms. Templin, Mr. Mueller, Ms. Magana, Mr. Buchanan, Ms. Sexton, and Ms. Blackburn.  (Kirksey Depo., pp. 121-122, 128-130, Plaintiff Exh. 3; Buchanan Depo., p. 36-37, Defendant Exh. 8).

19.  The final report submitted by Kirksey, dated September 15, 2005,  recommended that Farney be demoted to a non-supervisory position in the Health Department, or that any employees currently reporting to him be reassigned to another supervisor.  (Corriston Depo., p. 61-62, Plaintiff Exh. 1; Kirksey Depo., pp. 51, 129-130, 144-146, 168; Discrimination Complaint, 9/15/2005, Defendant Exh. 7).

20.  The County Manager did not follow Kirksey's recommendation.  Farney was disciplined with a one day suspension and directed to attend diversity training classes. Vanderford was disciplined with a two day suspension and directed to attend diversity training classes.  (Buchanan Depo., pp.  6-9, 14-17, 30-37, 49-54, Defendant Exh. 8;  Farney Depo., pp. 42-43, 46-48, Plaintiff Exh. 4).

21.  Plaintiff admits that the County Manager had the right to disregard Kirksey's recommendation and impose the discipline he deemed appropriate.  (Corriston Depo., p. 62-64, Plaintiff Exh. 1; Kirksey Depo., p. 91-92, Plaintiff Exh. 3).

22.  In October 2005, Corriston transferred to a different position in the Health Department, and Aiko Allen (Allen) became her immediate supervisor.  (Corriston Depo., p. 77-79, Plaintiff Exh. 1).

23.  In the new position, she was in charge of the tobacco use prevention grant in the Health Promotion and Disease Prevention Division.  (Corriston Depo., pp. 22-24, 77-79, 81, Plaintiff Exh. 1).

24.  Plaintiff requested a reclassification of her position with respect to Sedgwick County's compensation plan.  (Corriston Depo., p. 73-79, Plaintiff Exh. 1; Blackburn Depo., pp. 28-31, 37-40, Plaintiff Exh. 5; Farney Depo., p. 55-59, Plaintiff Exh. 4).

25.  For reclassification to occur under Sedgwick County's procedure, a Department Head must approve the request and send it on to the Human Resources Department (specifically Jane Morales) for consideration.  The Director of the Human Resources Department must also approve it and recommend it to the County Manager.  The request ultimately must be approved by the County Commission.  (Farney Depo., pp. 56-57, 90-93, Plaintiff Exh. 4; Sexton Depo., p 8-10, Defendant Exh 11).

26.  On October 11, 2005, Allen informed Corriston that Corriston's reclassification request was not being forwarded to the Human Resources Department, although the reclassification request of Kim Jones' position had been approved for that next step in the process.  Kim Jones also worked in the Health Promotion and Disease Prevention Division of the Sedgwick County Health Department.  (Corriston Depo., p. 73-77, Plaintiff Exh. 1; Allen Email 10/11/2005, Plaintiff Exh. 8).

27.  The email from Allen explained that Corriston's new position was not on the same

6

level as Kim Jones' position.  Jones' position was "a senior level public health educator with a grant that has shifted in responsibilities," whereas Corriston's tobacco prevention grant was "just beginning its second year of funding."  (Corriston Depo., p. 73-77, Plaintiff Exh. 1; Allen Email 10/11/2005, Plaintiff Exh. 8).

28.  Plaintiff did not make any further requests for reclassification.  (Corriston Depo., pp. 75-77, Plaintiff Exh. 1).

29.  Kim Jones' position was not reclassified.  (Blackburn Depo., p. 30-31, Plaintiff Exh. 5).

30.  On September 29, 2006, plaintiff informed her supervisor, Allen, that she planned on adopting a child.  (Corriston Depo., p. 82-86, Plaintiff Exh. 5).

31.  They discussed plaintiff's option to take leave under the Family Medical Leave Act (FMLA) or "telecommute" for a period of time.  To "telecommute" meant to be allowed to work at home instead of being required to come in to the office.  (Corriston Depo., p. 82-86, Plaintiff Exh. 1; Kirksey Depo., p. 60-64, Plaintiff Exh. 3).

32.  Two other individuals in the department had been approved for telecommuting.  (Corriston Depo., p. 84-88, Plaintiff Exh. 1).

33.  At the conclusion of the discussion, plaintiff and Allen decided it would be best for Corriston to request permission to telecommute.  Plaintiff submitted a written proposal to telecommute which would begin on November 1, 2006.  (Corriston Depo., p. 83-89, Plaintiff Exh. 1; Telecommuting Proposal, Defendant Exh. 13).

34.  Plaintiff's proposal requested that she would work in the mornings at the office, and in the afternoon, she would work from home.  (Corriston Depo., p. 83-85, Plaintiff Exh. 1,

Telecommuting Proposal, Defendant Exh. 13).

35.  On October 29, 2006, Allen sent an email to Corriston indicating that Corriston's telecommuting proposal had been approved with a 30 day trial period.  (Corriston Depo., pp. 89-90, 92-93, Plaintiff Exh. 1; Allen Email 10/29/2006, Defendant Exh. 14).

36.  On October 30, 2006, Allen was assigned as the director of the new Center for Health Equity within the Health Department.  Sonja Armbruster began  supervising the employees previously supervised by Allen.  (Corriston Depo., p. 95-97, Plaintiff Exh. 1; Blackburn Email 10/30/06, Defendant Exh. 15).

37.  On October 31, 2006, plaintiff received a written performance review by Allen for the prior 12 months.  The review was mostly favorable.  In all but one area, it was marked that the plaintiff "Fully Meets" the expectations of her job.  The review indicated that the plaintiff could improve her communication style and attitude and she could improve on her punctuality in getting to meetings and events.  (Corriston Depo., p. 90-92, Plaintiff Exh. 1; Plaintiff's Performance Review, Defendant Exh. 16).

38.  The final telecommuting plan was signed on November 3, 2006.  Plaintiff began telecommuting on November 6, 2006.  (Corriston Depo., pp. 90, 93, Plaintiff Exh. 1; Telecummuting Work Plan Agreement, Defendant Exh. 18).

39.  On November 15, 2006, Sonja Armbruster gave Corriston an oral reprimand regarding an incident related to a County Commissioners' meeting on that date.  Her telecommuting status was not rescinded.  (Corriston Depo., pp. 95-96, 99-100, 104, Plaintiff Exh. 1; Disciplinary Action Form, Defendant Exh. 17; Armbruster Depo., p. 36-37, Defendant Exh. 19).

40.  On December 4, 2006, a meeting was held in Armbruster's office, attended by plaintiff, Armbruster, Jeff Goetzinger (a Health Department employee), and Kirksey.  Plaintiff was presented with a memorandum regarding deficiencies which Armbruster perceived in her work performance.  (Corriston Depo., pp. 107-109, Plaintiff Exh. 1; Interoffice Memorandum, Defendant Exh. 20; Kirksey Depo., p. 81-88, Plaintiff Exh. 3; Armbruster Depo., pp. 31-32, 43-45, Defendant Exh. 19).

41.  Plaintiff's telecommuting arrangement was rescinded, effective as soon as possible or at the latest, by January 2, 2007.  (Corriston Depo., p. 108, Plaintiff Exh. 1; Armbruster Depo., pp. 30-31,51-53, Plaintiff exhibit 1;, Interoffice Memorandum, Defendant Exh. 20).

42.  On December 14, 2006, Corriston sent an email to Armbruster indicating that Corriston believed she had "no other option but to take FMLA leave because she did not have daycare available for her adopted child."  Corriston further indicated that the start date for the FMLA leave would be the next day, December 15, 2006.  (Corriston Depo., pp. 109-111, Plaintiff Exh. 1; Corriston Email 12/14/2006, Defendant Exh. 21).

43.  Corriston's request for FMLA leave effective December 15, 2006, was approved by the Human Resources Department.  For the next three months, she was on FMLA leave and did not complete any work for the Health Department.  She was scheduled to return to work approximately March 17, 2007, after her FMLA leave was exhausted.  (Corriston Depo., pp. 109-111, Plaintiff Exh. 1; FMLA Approval, Defendant Exh. 22).

44.  On March 6, 2007, Corriston sent an email to the Health Department Director, Blackburn, stating her intent to resign effective March 16, 2007.  That date was one day before Corriston was to return to work from FMLA leave.  (Corriston Depo., pp. 26-27, 114-116,

9

Plaintiff Exh. 1; Corriston Email 3/6/2007, Defendant Exh. 23; Plaintiff FMLA Approval, Defendant Exh. 22).

45.  Corriston's resignation email stated in relevant part: "This letter comes in effort to communicate my resignation as the Tobacco Use Prevention Project Manager at the Sedgwick County Health Department.  I am respectfully requesting release from employment effective March 16, 2007 for reasons as noted below.  As you are aware, I have been under a great deal of stress since reporting issues concerning misconducts (sic) among colleagues during my tenure with the Sedgwick County Health Department.  It was difficult to arrive at this decision, however, after great assessment and consideration of reasons that I cannot disclose other than to state a 'professional conflict of interest.' I feel that I am not able to work for the Sedgwick County Health Department any longer.  Regretfully, I understand that my desire to resign from the Sedgwick County Health Department would also cease any further employment with Sedgwick County, forfeiting more than 5 years of continued employment within the organization as a whole."  (Corriston Email 3/6/2007, Defendant Exh. 23).

46.  On the same day, Blackburn acknowledged and accepted Corriston's resignation. (Corriston Depo., pp. 26-27, 114-115, Plaintiff Exh. 1; Corriston Email 3/6/2007, Defendant Exh. 23; Blackburn Letter 3/6/2007, Defendant Exh. 24).

47.  On November 3, 2006, while plaintiff was still employed with Sedgwick County, she wrote a letter of retaliation complaint.  The letter contained a chronological history of her employment and complaints while at the Sedgwick County Health Department and a request for damages and relief. There is no evidence this was ever submitted to the Sedgwick County Human Resource Department, or to the Equal Employment Opportunity Commission (EEOC) or

Kansas Human Rights Commission (KHCR).  It was not signed by the plaintiff.  (Letter of

Retaliation Complaint, Defendant Exh. 3).

48.  On January 15, 2007, while on FMLA leave, plaintiff filed a charge of discrimination

with the EEOC and the KHRC alleging that Sedgwick County had discriminated against her on

the basis of race and gender and had also retaliated against her.  She asserted the discrimination

had occurred during a twenty-eight month period between August 16, 2004 and December 14,

2006.  (Charge of Discrimination, Defendant Exh. 2).

49.  The plaintiff's charge of discrimination alleged the following:

> i.  I was hired by respondent on or about 11/01 and currently hold a position as a
> Project Manager.
> ii.  I have been subjected to sexual harassment and I have dealt with race
> discrimination.
> iii.  I objected to the above.
> iv.  I have not received an increase in pay, although other Project Managers are
> range 24, and I have been denied telecommuting opportunities.
> v.  I believe this has been discrimination against me because of my sex, female,
> and my race, other, and retaliation against me in violation of Title VII.

(January 2007 EEOC Complaint, Defendant Exh. 2; Corriston Depo., pp. 37-39, 118-120,

Plaintiff Exh. 1).

50.  The plaintiff prepared and submitted to the EEOC a detailed chronology of events

from August 2004 to November 2006.  (Corriston Depo., p. 38-39, Plaintiff Exh. 1; Letter of

Retaliation Complaint, Defendant Exh. 3).

51.  On March 30, 2007, the EEOC advised the plaintiff by letter that her sexual

harassment and race discrimination claims were untimely for the purpose of EEOC

discrimination, and that there was insufficient evidence of retaliation for the EEOC to proceed

further with its investigation.  (EEOC Letter, Defendant Exh. 4).

52.  On or about August 18, 2007, Corriston filed a second administrative complaint with the EEOC and KHRC alleging retaliation on March 6, 2007.  The narrative of her complaint stated: "I believe that I was constructively discharged in retaliation for my discrimination complains in violation of Title VII of the Civil Rights Act."  (Corriston Depo., p. 94-95, Plaintiff Exh. 1; August 2007 EEOC Complaint, Defendant Exh. 25).

53.  Corriston also prepared and submitted a chronology of events for the period of November 13, 2006 to March 26, 2007.  (Corriston Depo., p. 95-96, Plaintiff Exh. 1; Corriston's Statement of Facts, Plaintiff Exh. 7).

III.  Standard of Review

Summary judgment is appropriate when "the pleading, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  Wright v. Abbott Labs., Inc., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  Faustin v. City & County of Denver, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  Allen at 839.

If the movant has the burden of proof on a claim, the movant must establish every

element of its claim or defense by sufficient, competent evidence.  Fed. R. Civ. P. 56(e).  The moving party may satisfy its burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  Alder v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

On a Title VII case, the Supreme Court has directed courts to apply a three-step burden shifting analysis to determine whether summary judgment is appropriate.  See McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 St.C. 1817, 36 L.Ed.2d 668 (1973).  Under McDonnell-Douglas, the plaintiff has the initial burden to present a prima facie case of retaliation or discriminatory treatment.  See id.  If a plaintiff can make out a prima facie case, the burden shifts to the employer to show a legitimate business reason for its action.  Id. at 806.  If the employer can offer such a reason, the burden shifts back to the plaintiff to present evidence from which a reasonable fact finder could conclude that the employer's offered reason is pretextual.  Paup v. Gear Products, Inc., 2009 WL 1740512, 6 (10th Cir. June 19, 2009).  A plaintiff may show pretextual motive by producing evidence which demonstrates that the employer's proffered reason for acting adversely is "unworthy of belief".  Adamson v. Multi Cmt. Diversitfied Servs. Inc., 514 F.3d 1136, 1146 (10th Cir. 2008).  The employee retains the burden of proving that his employer intentionally retaliated or discriminated against him.  Id at 1145.

IV.  Discussion

a. Title VII and its Exhaustion Requirement

Pursuant to Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).  Racial harassment claims based on hostile or abusive work environments may be filed pursuant to 42 U.S.C. § 2000e-2(a)(1).  Bolden v. PRC, Inc., 43 F.3d 545, 550 (10th Cir. 1995).  For the conduct to qualify as racial harassment, it must be "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'"  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 91 L.Ed.2d 49, 106 S.Ct. 2399 (1986) (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)).

A claimant "shall" seek administrative relief before filing suit under Title VII.  Peterson v. City of Wichita, 888 F.2d 1307, 1308 (10th Cir. 1989); 42 U.S.C. § 2000e-5(e)(1).  The inclusion of "shall" makes the administrative filing mandatory.  Belhomme v. Widnall, 127 F.3d 1214, 1216 (10th Cir. 1997).   Title VII requires a plaintiff to file an employment discrimination charge with the Equal Employment Opportunity Commission (EEOC) within 300 days after an "alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  The filing time period is not a jurisdictional prerequisite to a suit.  The requirement is similar to a statute of limitations, subject to waiver, estoppel and equitable tolling.  Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1174-75 (10th Cir. 1998).  After receiving the right-to-sue letter from the EEOC, the plaintiff has 90 days to file suit. Belhomme, 127 F.3d at 1216.  "Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations."  Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 502 (7th

14

Cir. 1994).

Hostile work environment claims involve repeated conduct.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  Therefore, unlawful conduct cannot be said to have occurred on any particular day.  A hostile work environment claim occurs over a period of time, and is composed of a series of acts which constitute one "unlawful employment practice."  Id. at 117.  Therefore, the claimant must file the administrative action within 300 days of any act that is part of the hostile work environment.  Id. at 118.

"When an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge."  Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003).  A claim is "reasonably related" to the EEOC charge allegations "when 'the conduct complained of would fall within the scope of the administrative investigation which can reasonably be expected to grow out of the charge that was made.'"  Mitchell v. City & County of Denver, 112 Fed. Appx. 662, 667 (10th Cir. 2004) (quoting Deravin v. Kerik, 335 F.3d 195, 200-01 (2nd Cir. 2003)).

1. Sexual Harassment

The plaintiff claims she was subjected to a hostile work environment based on gender. The plaintiff's claim is based on three incidents.  The first incident was the email sent by her supervisor, William Farney, in response to her request for CPR recertification.  Plaintiff requested time off to attend the CPR class, and Farney responded, "Only if you promise to use it on me if needed."  (Def. Exh. 9).  The email was sent and received on August 17, 2004.  The

second incident occurred when Farney was staring at the plaintiff's chest on April 21, 2005.  The

third claim by the plaintiff is that Farney would lean over her desk at a 90 degree angle to talk to

her.  The plaintiff testified that this only occurred while she was working for him.  She stopped

working for him in October, 2005.

The defendant argues the plaintiff's claim is untimely as she did not file with the EEOC

within the 300 day time period.   The plaintiff filed a charge of discrimination on January 15,

2007.  Three hundred days prior to that date is March 21, 2006.  None of the incidents of alleged

sexual harassment occurred in the 300 day time period.  The plaintiff was not working for Farney

during the prior 300 day time period.  The plaintiff has failed to exhaust administrative remedies.

The plaintiff has not alleged, and the court does not find, that her claims are subject to waiver,

estoppel, or equitable tolling.  The plaintiff does not contend that any of the acts supporting the

sexual harassment claim occurred during this time period.  Therefore, the court is barred from

addressing the sexual harassment claim.  See DeWalt v. Meredith Corp., 288 Fed.Appx. 484, 492

(10th Cir. 2008).

2. Racial Harassment

The plaintiff claims she was subject to racial harassment based on three comments made

by Lori Vanderford, an employee of the Sedgwick County Health Department.  On February 7,

2005, Vanderford asked Ana Arrendondo, who is Hispanic, "why do your people smell the way

they do?"  Plaintiff was present when Vanderford made this comment.  Vanderford made two

other comments outside the presence of the plaintiff.  She had referred to Brazilian nuts as

"nigger toes," and had referred to an employee of Middle Eastern ancestry as a "rag head."  On

February 8, 2005, Corriston and Arrendondo met with Farney regarding the comments made by

Vanderford.

The defendant argues the plaintiff's claim is untimely as she did not file with the EEOC within the 300 day time period.   The plaintiff filed a charge of discrimination on January 15, 2007.  Three hundred days prior to that date is March 21, 2006.  None of the incidents of alleged racial harassment occurred in the 300 day time period.  The plaintiff has failed to exhaust administrative remedies.  The plaintiff has not alleged, and the court does not find, that her claims are subject to waiver, estoppel, or equitable tolling.  The plaintiff does not contend that any of the acts supporting the racial harassment claim occurred during this time period.  Therefore, the court is barred from addressing the racial harassment issue.  See DeWalt v. Meredith Corp., 288 Fed.Appx. 484, 492 (10th Cir. 2008).

b.  Title VII discrimination

Although the plaintiff's race and sex discrimination claims under Title VII are barred, the analysis is important to the plaintiff's timely filed charges of retaliation and constructive discharge.

Plaintiff claims discrimination based on a hostile work environment.  To establish a prima facie claim for hostile work environment under Title VII, plaintiff must show (1) that she is a member of a protected class; (2) that the conduct in question was unwelcome; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to create an abusive working environment.  Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007).  The plaintiff must also show a basis for holding the employer liable.  Id.  Plaintiff must show that sexually oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment.

17

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

The plaintiff is a member of a protected class.  The conduct in question, the suggestive email, Farney looking at her chest, and Farney leaning over her desk, was unwelcome.  Farney sent an email with a comment that can easily be construed to include an implicit proposal of sexual activity.  Also, Farney's conduct of staring at plaintiff's chest could be interpreted as an implicit proposal of sexual activity.  However, the plaintiff cannot show that the harassment was sufficiently severe or pervasive to create an abusive working environment.

To determine if a reasonable person would find the work environment hostile or abusive, the court must look at the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Faragher v. City of Boca Raton, 524 U.S. 775,787-88,  118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  Isolated incidents will not amount to discriminatory changes in the terms and conditions of employment.  Id. at 788.  The plaintiff has not presented evidence that Farney's conduct interfered with her work performance.  Also, the incidents are isolated and infrequent, and were not physically threatening or humiliating.

The plaintiff must show that a "rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment" to survive summary judgment on a racially hostile work environment claim.  Sandoval v. city of Boulder, 388 F.3d 1312, 1327 (10th Cir. 2004).  The plaintiff must show a "steady barrage of opprobrious racial comments".  Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007).  Plaintiff cannot establish a hostile work environment by "demonstrating a few isolated incidents of racial

enmity or sporadic racial slurs." <u>Id.</u>  The plaintiff has not shown that Vanderford's three isolated comments were so severe or pervasive to alter the conditions of her employment, or create an abusive working environment.

c.  Retaliation

Title VII makes it unlawful for an employer "to retaliate against an employee when that employee takes action in opposition to a discriminatory practice."  42 U.S.C. § 2000e-3(a).   To prove a claim for retaliation, a plaintiff must show circumstantial evidence or present direct evidence of discrimination.  <u>Stone v. Autoliv ASP, Inc.</u>, 210 F.3d 1132, 1136 (10th Cir. 2000).  Direct evidence demonstrates on its face that the employment action was discriminatory.  <u>Ramsey v. City & County of Denver</u>, 907 F.2d 1004, 1008 (10th Cir. 1990).  A plaintiff may prove discrimination through direct evidence by establishing proof of "an existing policy which itself constitutes discrimination."  <u>Id.</u>, citing <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).  Circumstantial evidence permits the fact finder to draw a reasonable inference from facts indirectly related to discrimination to show that discrimination, in fact, has occurred.  <u>Stone</u>, 210 F.3d at 1136.

When there is no direct evidence, the court engages in the three step burden shifting framework established by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  The plaintiff bears the initial burden of establishing a prima facie case of retaliation.  <u>Vaughn v. Epworth Villa</u>, 537 F.3d 1147, 1150 (10th Cir. 2008).  To establish a prima facie case of retaliation, the plaintiff must demonstrate (1) that she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection between the protected activity and the

materially adverse action.  <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1202

(10th Cir. 2006).  Once the employee establishes a prima facie case of retaliation, the burden of

production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the

adverse employment action.  <u>O'Neal v. Ferguson Constr. Co.</u>, 237 F.3d 1248, 1252 (10th Cir.

2001).  If such a reason is articulated, the employee must then demonstrate that the employer's

proffered reason for the adverse action is pretextual.  <u>Id.</u>

To establish adverse employment action, plaintiff must experience " a significant change

in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits."  <u>Burlington</u>

<u>Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  An action is

materially adverse if it "well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination."  <u>Burlington Northern & Santa Fe Ry. V. White</u>, 548 U.S.

53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

The plaintiff has not presented direct evidence to support her claim of retaliation.

Therefore, the court engages in the three step burden shifting framework.  In the first step, the

plaintiff must show that she engaged in protected opposition to discrimination.  The plaintiff

filed a complaint with her supervisor, and then with human resources regarding racial comments

made by an employee of Sedgwick County.  This action satisfies the first step of the prima facie

case of retaliation.  The plaintiff claims she then suffered two materially adverse actions.

1.  <u>Failure to increase salary</u>

Plaintiff claims the denial of  her request for salary increase or reclassification constitutes

a materially adverse action.  Judge Vratil has held that a failure to increase a job grade level or

reclassify a job constitutes an adverse employment action.  Nelson v. Sprint/United Mgmt. Co.,
2006 WL 2734586, 9 (D. Kan. Sept. 25, 2006).  The plaintiff must show that her performance
merited a salary increase.  Amro v. Boeing Co., 232 F.3d 790, 799 (10th Cir. 2000).  The
plaintiff transferred to a new position in which she was placed in charge of the tobacco use
prevention grant in the Health Promotion and Disease Prevention Division.  Plaintiff requested a
reclassification of her position.  The request was denied.

 The denial of reclassification occurred a month after the final report issued by Kirksey.
The plaintiff can establish a causal connection by presenting evidence that "protected conduct
was closely followed by adverse action."  Haynes v. Level 3 Communications, LLC, 456 F.3d
1215, 1228 (10th Cir. 2006).  The close proximity of time between the adverse action and the
plaintiff's denial of reclassification establishes the casual connection.  The plaintiff has satisfied
the third prong.

 The defendant has articulated a legitimate, nondiscriminatory reason for the denial of
reclassification.  The plaintiff was informed that her position did not warrant a reclassification as
it was a lateral transfer.  Further, after the position was reviewed, plaintiff received a step
increase for her pay to reflect her job duties.

 The Tenth Circuit does not allow temporal proximity alone to satisfy the evidentiary
requirement that the plaintiff demonstrate pretext.  Metzler v. Fed. Home Loan Bank of Topeka,
464 F.3d 1164, 1172 (10th Cir. 2006).  The plaintiff must present temporal proximity as well as
other evidence.  The plaintiff may establish pretext by demonstrating "such weaknesses,
implausibilities, inconsistencies, incoherent, or contradictions in the employer's proffered
legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy

21

of credence." <u>Twilley v. Integris Baptist Med. Ctr., Inc.</u>, 16 Fed.Appx. 923, 925 (10th Cir. 2001).  This may be done by (1) showing the defendant's legitimate reason is false, (2) showing that the defendant acted contrary to a written policy, or (3) showing the defendant acted contrary to an unwritten policy or company practice.  <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000).  The plaintiff has not presented evidence to show the defendant's proffered reason is pretextual.  See <u>Branson v. Price River Coal Co.</u>, 853 F.2d 768, 772 (10th Cir. 1988), "mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."  The plaintiff was provided a legitimate reason for the denial of reclassification.  The plaintiff has not provided evidence that the defendant's reason is false or the defendant acted contrary to a written or unwritten policy.  The plaintiff was not the only employee denied reclassification.  Kim Jones, an employee that also worked as a public health educator, was also denied reclassification.   The plaintiff has failed to come forward with sufficient facts to preclude summary judgment on this claim.

    2.  <u>Telecommuting</u>

The plaintiff claims the rescinding of her telecommuting privileges was a materially adverse action.  Judge Vratil has addressed this issue recently.  In <u>Homburg v. UPS</u>, 05-cv-2144-KHV (D. Kan. 2006),  the court determined, after examining case law from other circuits, that denying an employee's request to work from home did not constitute an adverse employment action.

Even if plaintiff could establish that rescinding her telecommuting privileges was a materially adverse action, the plaintiff cannot establish a causal connection.  In <u>Hysten v.</u>

Burlington Northern & Santa Fe Ry., the court found that adverse employment action that happened more than three months after the protected activity was not entitled to a presumption of causation.  296 F.3d 1177, 1183-84 (10th Cir. 2002).  The passage of time does not bar a plaintiff's retaliation claim.  If the plaintiff cannot establish temporal proximity between the protected activity and the retaliatory conduct, she must present additional evidence to establish causation.  The court should look to other evidence in the record to establish if an adverse employment action was in response to earlier protected activity.  Piercy v. Maketa, 480 F.3d 1192, 1199 (10th Cir. 2007).  The plaintiff has not presented any evidence to show the denial of her telecommuting was in response to her discrimination complaints.

The defendant has set forth a legitimate reason for rescinding plaintiff's ability to telecommute.  The defendant provided evidence of a disciplinary action form, dated November 20, 2006, in which the plaintiff was reprimanded for failing to meet the goals of her job.  The telecommuting plan was not rescinded at that time.  On December 4, 2006, in a meeting between plaintiff and her supervisor, Armbruster, plaintiff was reprimanded for not meeting the goals of her employment, and the telecommuting agreement was suspended.  On this evidence, the plaintiff cannot show her telecummuting privileges were rescinded for retaliation.

d.  Constructive Discharge

An employee is constructively discharged "when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit."  MacKenzie v. City & County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005).  The court applies an objective test, asking "whether a reasonable person would view the working conditions as intolerable."  Id.  The plaintiff must show that she had no other choice

but to quit.  Sanchez v. Denver Public Schools, 164 F.3d 527, 534 (10th Cir. 1998).  A plaintiff

who voluntarily resigns cannot claim that she was constructively discharged.  Exum v. United

States Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004).

Under the facts of this case, a reasonable jury could not find the plaintiff was

constructively discharged. The facts establish that in December, 2005, the plaintiff sent an email,

in which she stated, she had "no other option at this time but to take FML as I do not have

daycare available."  At the end of plaintiff's FMLA absence, she resigned her position, citing

"stress since reporting issues concerning misconducts among colleagues" and "professional

conflict of interest."  The plaintiff's claims for harassment and retaliation do not survive

summary judgment.  A rational trier of fact could not conclude that the  isolated incidents

described by the plaintiff would be viewed as intolerable by a reasonable person.  The court has

determined that the plaintiff has not shown sufficient evidence of discrimination or retaliation.

By the same token, the plaintiff has not shown that her working conditions were so intolerable

that she had no other option.  The Tenth Circuit has held that a claim for constructive discharge

is essentially a claim for aggravated hostile work environment.  Hall v. United States Dep't of

Labor, 476 F.3d 847, 852 (10th Cir. 2007).  Plaintiff's claim for constructive discharge therefore

fails, as her claim for hostile work environment fails.

V.  Conclusion

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc.

74) be GRANTED  in accordance with the above rulings.

The clerk is ordered to enter judgment for the defendant in accordance with this order.

SO ORDERED this 30th day of June, 2009.

24

 s/ Wesley E. Brown
Wesley E. Brown, U.S. Senior District Judge